**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAVON BICARIE, BRUCE D'AMICO, CURTIS BOWEN, KYLE BOWEN, JAMILE DAVIS, COREY NAZAIRE, DAVINDRA SINGH, PATRICK HODGES, KIMBERLY WARREN, KEITH WRIGHT, DARWIN MARTINEZ, ARTHUR JONES, JITU RAHMAN, and ORVILLE HALL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>ARCH AUTO PARTS, LLC; NEXAMOTION GROUP, LLC; TRANSTAR INDUSTRIES, LLC; PARTS DISTRIBUTION XPRESS, INC.; PDX NORTH, INC.; QUESTFLEET, LLC; CALLAIDA LLC; NOVA EXPRESS DELIVERS LLC; SANCHEZ DELIVERY SYSTEMS INC.; and JOHN DOE CORPORATIONS 1 through 10,<br><br>Defendants. | Civil Action No. 1:26-cv-07065<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT** |

Plaintiffs Javon Bicarie, Bruce D'Amico, Curtis Bowen, Kyle Bowen, Jamile Davis, Corey Nazaire, Davindra Singh, Patrick Hodges, Kimberly Warren, Keith Wright, Darwin Martinez, Arthur Jones, Jitu Rahman, and Orville Hall (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, allege the following against Defendants Arch Auto Parts, LLC ("Arch"), NexaMotion Group, LLC ("NexaMotion"), Transtar Industries, LLC ("Transtar," together with Arch and NexaMotion, the "First Tier Defendants"), Parts Distribution Xpress, Inc., PDX North, Inc. (together with any other PDX-branded corporate affiliate, the "PDX Defendants"), Questfleet, LLC, CallAida LLC (together with Questfleet, the "Quest Defendants"), Nova Express Delivers LLC, Sanchez Delivery Systems Inc. (together, the "Third-Tier Defendants"), and John Doe Corporations 1 through 10 (collectively, "Defendants"), upon personal knowledge as to each Plaintiff's own acts, and upon

information and belief as to all other matters, based upon, among other things, the investigation conducted by their counsel:

## I. PRELIMINARY STATEMENT

1. This is a wage-and-hour action arising out of Defendants' systematic misclassification of Plaintiffs and similarly situated delivery drivers as independent contractors, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the New York Labor Law, N.Y. Lab. Law ("NYLL") §§ 190 *et seq.*, 650 *et seq.*, and 195, and the implementing regulations at 12 N.Y.C.R.R. Part 142.

2. This case concerns a classic two-tier scheme to misclassify Arch auto parts delivery drivers as independent contractors rather than employees. The scheme is nearly as old as the overtime and minimum wage laws themselves. Almost eighty years ago, in *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947), the Supreme Court held that meat boners passed through a series of nominally independent straw men remained employees of the company that actually controlled their work. Merely rotating the name on the workers' paychecks did not change who directed the labor.

3. In this case, in furtherance of the Arch driver misclassification scheme, first-tier Defendant Arch, later joined by its parent, NexaMotion, and NexaMotion's affiliate, Transtar, engaged a series of straw man second-tier entities, beginning with Diligent Delivery Systems ("Diligent"), then Defendant Questfleet, then Defendant CallAida, then the PDX Defendants (Parts Distribution Xpress, Inc. and PDX North, Inc.), to stand between Arch and the drivers who did its work. In reality, the first-tier Defendants maintain extraordinary operational control over the Arch drivers. Below the PDX Defendants sits a third tier: Defendants Nova Express Delivers LLC and Sanchez Delivery Systems Inc. (the "Third-Tier Defendants"), entities that, on information and

belief, are owned or operated by PDX supervisors and that pay drivers whom the PDX Defendants will not pay through their own channel, at reduced rates, for the same Arch work. At the bottom of the chain, drivers were paid through companies run by PDX supervisors, or from a PDX manager's personal account, and drivers paid that way received less than the promised day rate for the same work.

4. The two-tier misclassification scheme has seen a resurgence in recent years, as the so-called gig economy has allowed a cottage industry for second-tier entities like Diligent, Questfleet, CallAida, and PDX to flourish. Indeed, PDX's own website, pdxdelivers.com, states that its "independent driver" model cuts client costs "by up to 30%" compared to operating an in-house fleet. The vast majority of that difference does not come from any genuine efficiency PDX provides, but from classifying drivers as independent contractors, circumventing tax obligations and wage protections, and foisting onto the drivers themselves costs an employer would otherwise bear directly. The model remains profitable for the companies that use it, and the lawsuits and settlements it generates are treated as a cost of doing business.[1],[2]

---

[1] PDX North, Inc., a Defendant in this case, agreed to pay up to $7 million to settle a New Jersey Department of Labor enforcement action after four audits found that it had misclassified more than 1,000 delivery drivers as independent contractors. *See infra* Section IV.E.3.

[2] The industry's own track record confirms that this scheme is a calculated cost of doing business, and that it does not shield the auto-parts companies that use it. Diligent, the first intermediary in Arch's chain, was sued by the United States Secretary of Labor for FLSA minimum-wage, overtime, and recordkeeping violations against drivers who delivered auto parts for Diligent's clients, including auto-parts distributor Parts Authority Arizona, LLC. *Sec'y of Labor v. Ariz. Logistics, Inc. d/b/a Diligent Delivery Sys.*, No. 2:16-cv-04499-DLR, ECF No. 282 (D. Ariz. Jan. 6, 2023) (First Amended Consent Judgment and Permanent Injunction), *available at* https://storage.courtlistener.com/recap/gov.uscourts.azd.1015178/gov.uscourts.azd.1015178.282.0.pdf. The court entered a $5,750,000 judgment. Diligent and its chief executive were held liable for $5,700,000 of it: $2,800,000 in back wages owed to 1,398 drivers for pay periods dating back to April 2012, an equal $2,800,000 in liquidated damages, and $100,000 in civil money penalties, a sanction the FLSA reserves for repeated or willful wage violations. *Id.* § III.1 & Ex. A; 29 U.S.C. § 216(e)(2). In that case, Diligent failed to insulate its client, Parts Authority, the auto-parts seller. Parts Authority was held liable for up to $1,438,000 of the same judgment, including $694,000 in back wages, $694,000 in liquidated damages, and its own $50,000 civil money penalty, and it agreed to guarantee Diligent's payments if Diligent defaulted. *Id.* §§ III.2, III.5. Most tellingly, Parts Authority stipulated, and the court ordered, that the drivers who deliver its auto parts in Arizona, other than seasonal drivers employed by third parties, were Parts Authority's own employees, entitled to the full protections of the FLSA. *Id.* §§ I.6, II.3. Every defendant, along with its "successor companies" and all persons "acting in concert or participation" with it,

5. By treating Arch delivery drivers as 1099 contractors rather than employees, Defendants avoid paying the employer's share of Social Security and Medicare taxes, federal and state unemployment insurance, workers' compensation insurance, health insurance and other employee benefits, most significantly the minimum wage and overtime premium payments owed to Arch drivers. At the same time, drivers are made to bear, out of their own pockets and without reimbursement, the cost of purchasing, insuring, maintaining, and fueling the very vehicles PDX's marketing boasts it does not have to provide. PDX's own advertised 30% in savings is, in substance, an admission of how much of Defendants' cost structure depends on avoiding the obligations of an actual employer.

6. As a direct and proximate result of this misclassification, Defendants: (a) failed to pay Plaintiffs and similarly situated drivers the minimum wage and overtime compensation to which they were entitled; (b) took unlawful deductions from drivers' pay, including a recurring weekly fee of approximately $30 to $40, given various labels, and, for certain workers, an additional payroll-processing fee of, on information and belief, approximately 10 percent of their pay for the privilege of having their payments run through third-tier payor entities operated by PDX managers with the knowledge and consent of Defendant Arch and the PDX Defendants; and (c) failed to furnish drivers with the wage notices and accurate, itemized wage statements required by the New York Wage Theft Prevention Act ("WTPA").

7. All Plaintiffs other than Plaintiff Warren (the "FLSA Plaintiffs") bring their FLSA claims (Counts I and II) as a collective action on behalf of themselves and all similarly situated current and former delivery drivers pursuant to 29 U.S.C. § 216(b). All Plaintiffs bring their NYLL claims (Counts III, IV, V, VI, and VII) as a class action on behalf of themselves and all similarly

---

was permanently enjoined from violating the FLSA, and Diligent was ordered to record its drivers' daily hours and miles. *Id.* §§ II.1, II.2.

situated current and former delivery drivers who worked for Defendants in New York, pursuant to Federal Rule of Civil Procedure 23. On information and belief, the proposed collective and class include hundreds of current and former Arch delivery drivers across Defendants' multiple New York locations.

## II. JURISDICTION AND VENUE

8. This Court has federal question jurisdiction over FLSA Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

9. This Court has supplemental jurisdiction over Plaintiffs' NYLL claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiffs' FLSA claims that they form part of the same case or controversy.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including at Arch's locations in Kings County, Queens County, and Nassau County, and because one or more Defendants reside in, are subject to personal jurisdiction in, and/or regularly transact business in this District.

11. At all relevant times, Defendants employed more than two persons and have been, and continue to be, employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

12. On information and belief, at all relevant times, Arch, NexaMotion, and Transtar, individually, and Defendants, collectively as a single enterprise, have had an annual gross volume of sales made or business done of not less than $500,000. 29 U.S.C. § 203(s)(1)(A)(ii).

13. At all relevant times, Defendants were an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. §§ 203(r)(1) and

203(s)(1). Defendants' employees, including Plaintiffs, handled auto parts and other goods that had been moved in or produced for commerce, as defined in 29 U.S.C. § 203(b).

## III. PARTIES

### A. Plaintiffs

14. Each Plaintiff is a natural person who worked as a delivery driver or shuttle driver, delivering automotive parts from one or more Arch locations in New York between Arch locations and/or to Arch customers. As used in this Complaint, the "Class Period" means the period beginning six years and 228 days before the filing of this Complaint, as set forth in Section VI below.

15. Plaintiff Javon Bicarie resides in Rosedale, New York. Since approximately June 2022, he has worked as an Arch shuttle driver and customer delivery driver, and he remains employed by Defendants. He has been dispatched from the Arch locations at Jamaica and Inwood and, since approximately July 14, 2025, from Mineola. At times he has made regular deliveries to Arch locations in Connecticut. During the Class Period, he has worked for Arch through the Quest Defendants, then the PDX Defendants. Bicarie was removed from his regular shuttle run at the request of Arch vice president Moe Ali. Arch manager Navin also suspended Bicarie for driving "too slow." In nearly every week until June 2026, Plaintiff Bicarie worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He has never been paid overtime premium pay. Since approximately June 2026, he has worked approximately 8:00 a.m. to 2:00 p.m., Monday through Friday, at $100 per day.

16. Plaintiff Bruce D'Amico resides in Floral Park, New York. Since approximately June 2022, he has worked as an Arch delivery driver, and he remains employed by Defendants.

He is dispatched from the Arch locations at Mineola, Plainview, Elmont, and Jamaica. During the Class Period, he has worked for Arch through the Quest Defendants, then the PDX Defendants, and now Nova Express, a company operated by PDX supervisor Shazarudin Subhan (see Section III.H below). In nearly every week until June 2026, Plaintiff D'Amico worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He has never been paid overtime premium pay. Since approximately June 26, 2026, having accepted a reduced schedule, he has worked approximately 8:00 a.m. to 2:00 p.m., six days per week, at a nominal rate of $100 per day, from which Nova Express takes its cut. When an Arch manager requires him to stay until approximately 5:00 p.m., he is paid approximately $118 for the day after Nova Express takes its cut.

17. After the PDX Defendants' screening process rejected Plaintiff D'Amico, Defendants routed his pay through Nova Express, a nominally separate paying entity outside the PDX Defendants' ordinary channel. D'Amico was told he would be paid under a "master contractor" and was asked for his bank account and routing information. His bank deposits since then have been labeled "Direct Deposit from NOVA EXPRESS DEL for PAYROLL." Nova Express deducts an additional payroll-processing fee of approximately 10 percent of his pay, on top of the weekly fees described in Section IV.C below. After the transfer, D'Amico continued to perform the same work, at the same Arch location, under the same supervision, subject to the same PDX identification and uniform requirements, but at reduced pay that did not include overtime and fell below the applicable minimum wage. For example, on August 21, 2026, Nova Express deposited $534 for the six days from Monday, August 10 through Saturday, August 15, 2026, in which he worked at least approximately 36 hours, or no more than approximately $14.83 per hour, below the $17.00 New York minimum wage. Since approximately summer 2025, at the direction

of the PDX Defendants, D'Amico has also trained approximately 20 to 30 new drivers for Arch's delivery operation, mostly at the Arch Mineola location and also in Plainview. He drove trainees on Arch routes in his own vehicle to teach them the Extra Driver application and Arch's rules and procedures. Those trainees then went on to work at other Arch locations. He was required to report on the trainees' progress to Arch manager Navin and to PDX Key Account Manager Jariel Nevarez.

18. Plaintiff Curtis Bowen resides in Far Rockaway, New York. From approximately 2019 to approximately January 2024, he worked as a delivery driver dispatched from the Arch locations at Guy R. Brewer Boulevard, Eastern Parkway, and Hollis. During the Class Period, he worked for Arch through Diligent and the Quest Defendants. In nearly every week, Plaintiff C. Bowen worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

19. Plaintiff Kyle Bowen resides in West Hempstead, New York. From approximately January 2024 to approximately September 2025, he worked as a delivery driver dispatched from the Arch locations at Mineola, Plainview, and Jamaica. During the Class Period, he worked for Arch through the Quest Defendants, then through the PDX Defendants, and then through Sanchez Delivery. While he was paid through Sanchez Delivery, Defendants also took an additional deduction from his pay, described to him as a fee "to process payroll." In nearly every week, Plaintiff K. Bowen worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

20. Plaintiff Jamile Davis resides in Brooklyn, New York. From approximately late 2017 to approximately summer 2024, he worked as a delivery driver dispatched from the Arch locations at Guy R. Brewer Boulevard, Kew Gardens, Hollis, and Eastern Parkway, with a Sunday route from Utica Avenue. During the Class Period, he worked for Arch through the Quest Defendants. In nearly every week, Plaintiff Davis worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

21. Plaintiff Corey Nazaire resides in South Ozone Park, New York. From approximately 2022 to approximately June 2024, he worked as a delivery driver dispatched from the Arch locations at Hollis and Mineola. During the Class Period, he worked for Arch through the Quest Defendants. In nearly every week, Plaintiff Nazaire worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

22. Plaintiff Davindra Singh resides in Queens, New York. From approximately September 9, 2023 to approximately December 2024, he worked as a delivery driver dispatched from the Arch locations at Hollis and Mineola. During the Class Period, he worked for Arch through the Quest Defendants, then through the PDX Defendants. Singh's employment ended when Arch manager Navin told him it had no more work for him. In nearly every week, Plaintiff Singh worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

23. Plaintiff Patrick Hodges resides in St. Albans, New York. Since approximately December 2022, he has worked as a delivery driver dispatched from the Arch locations at Hollis

and Elmont, and he remains employed by Defendants. During the Class Period, he has worked for Arch through the Quest Defendants, then through the PDX Defendants. In nearly every week, Plaintiff Hodges worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He has never been paid overtime premium pay.

24. Plaintiff Kimberly Warren resides in Flushing, New York. From approximately June 2021 to approximately March 2023, she worked as a delivery driver dispatched from the Arch location at Mineola. During the Class Period, she worked for Arch through the Quest Defendants. In nearly every week, Plaintiff Warren worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. She was never paid overtime premium pay.

25. Plaintiff Keith Wright resides in Springfield Gardens, New York. From approximately December 20, 2023 to approximately August 10, 2025, he worked as a delivery driver dispatched from the Arch locations at Plainview, Mineola, Woodside, and Hollis. During the Class Period, he worked for Arch through the Quest Defendants, then through the PDX Defendants. An Arch dispatcher and Arch supervisors at each location, including Navin, directed his daily work. Under the Quest Defendants, his supervisor was Raymond Pacheco. After November 2024, his PDX supervisor was PDX Key Account Manager Jariel Nevarez. In nearly every week, Plaintiff Wright worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

26. Plaintiff Darwin Martinez resides in Queens Village, New York. He worked as a delivery driver dispatched from the Arch locations at Jamaica, Mineola, and Plainview from

approximately December 2022 to approximately October 2023 and from approximately September 2025 to approximately January 2026. During the Class Period, he worked for Arch through the Quest Defendants, then the PDX Defendants, and then was paid through Nova Express, operated by PDX supervisor Subhan (see Section III.H below). When Defendants moved his pay to Nova Express, they began deducting an additional payroll-processing fee of approximately 10 percent of his pay, on top of the standard weekly fees described in Section IV.C below. On one occasion in 2023, Rasheesh, an Arch supervisor at the Jamaica location, yelled at him and threatened to dock his pay for an hour. In nearly every week, Plaintiff Martinez worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

27. Plaintiff Arthur Jones resides in Jamaica, New York. From approximately January 2018 to approximately July 2026, he worked as a delivery driver dispatched from the Arch locations at Mineola, Stuyvesant, Eastern Parkway, Jamaica, and Flatlands Avenue. During the Class Period, he worked for Arch through Diligent, then the Quest Defendants, then the PDX Defendants. Jones was terminated after a disagreement with Arch manager Navin, when PDX Key Account Manager Jariel Nevarez told him that Navin would not let him work anymore. In nearly every week, Plaintiff Jones worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

28. Plaintiff Jitu Rahman resides in Jamaica, New York. From approximately April 17, 2026 to approximately May 27, 2026, he worked as a delivery driver dispatched from the Arch location at Jamaica, making deliveries between Arch stores and picking up returned parts. During the Class Period, he worked for Arch through the PDX Defendants and was paid by Zelle transfer

directly by PDX Key Account Manager Jariel Nevarez. Plaintiff Rahman was offered the job at a flat day rate of $135 per day, but was paid only approximately $115 per day. Rahman was told he would be paid the reduced rate because of onboarding paperwork issues. On information and belief, Arch and the PDX Defendants knew of and consented to this practice. In nearly every week, Plaintiff Rahman worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on weekends. He was never paid overtime premium pay.

29. Plaintiff Orville Hall resides in Jamaica, New York. Since at least approximately June 2022, he has worked as a delivery driver dispatched from the Arch location at South Ozone Park, and at times from other Arch locations in Queens, Brooklyn, and Long Island, and he remains employed by Defendants. During the Class Period, he has worked for Arch through the Quest Defendants, then the PDX Defendants, and now Nova Express. In nearly every week, Plaintiff Hall worked at least approximately 8.5 hours per day, Monday through Friday, or at least approximately 42.5 hours, plus additional hours on Saturdays. He has never been paid overtime premium pay. Approximately two years ago, he was paid approximately $145 per day. He is now paid approximately $120 per day, and Defendants take a fee of approximately $60 per week from his pay.

30. "FLSA Plaintiffs" include all named Plaintiffs other than Plaintiff Warren. FLSA Plaintiffs have consented, or will promptly consent, in writing to be party plaintiffs to this action pursuant to 29 U.S.C. § 216(b).

**B. Defendant Arch Auto Parts, LLC**

31. Defendant Arch Auto Parts, LLC ("Arch") is a limited liability company that operates a chain of approximately eighteen retail automotive-parts stores and delivery operations in New York and Connecticut.

32. Arch operates a multi-location automotive-parts delivery business in which Arch dispatches deliveries, sets drivers' schedules and routes, controls the retail and warehouse locations from which drivers work, and, at the direction of its parent, NexaMotion Group, enforces uniform and conduct policies applicable to drivers.

33. At all relevant times, Arch dispatched delivery assignments and routes to Plaintiffs and similarly situated drivers, set and enforced drivers' schedules, controlled the premises from which drivers picked up parts for delivery, supervised and micromanaged drivers' work performance, and required drivers to use a dispatch, GPS-tracking phone application ("Extra Driver"), from which Arch monitored drivers' precise location, performance, time worked, and vehicle speed. Arch required drivers to wear branded uniforms supplied by whichever intermediary was then staffing Arch's delivery operation, and to comply with Arch's appearance and conduct policies, and otherwise controlled the manner and means by which Plaintiffs and similarly situated drivers performed their work.

34. Arch is an "employer" of Plaintiffs and similarly situated drivers within the meaning of the FLSA, 29 U.S.C. § 203(d), and the NYLL, N.Y. Lab. Law § 190(3), whether as their direct employer, a joint employer, or part of a single, integrated enterprise together with NexaMotion, Transtar, the PDX Defendants, Questfleet, CallAida LLC, the Third-Tier Defendants, and/or the John Doe Defendants.

**C. Defendant NexaMotion Group, LLC**

35. Defendant NexaMotion Group, LLC ("NexaMotion") is a Delaware limited liability company with its principal place of business in Walton Hills, Ohio. NexaMotion is a division of Transtar Holding Company. NexaMotion, the parent company that acquired Arch in or around 2023, runs Defendant Arch and at least nine other automotive-aftermarket brands, and has, since that acquisition, directly controlled material terms and conditions of Plaintiffs' work. On information and belief, all Arch store paychecks, including the paychecks of Arch's own store-level managers, are issued under the NexaMotion name, and the network and other store-level infrastructure at Arch locations is likewise labeled with the NexaMotion name and branding.

36. In or about August 2026, upper management of NexaMotion, traveling from NexaMotion's offices in Ohio, personally directed Arch's delivery drivers, in person, that a branded hat would no longer satisfy the existing uniform policy the PDX Defendants had themselves set, and that drivers were instead required to wear a branded t-shirt, polo shirt, or sweatshirt. This directive overrode the PDX Defendants' own, more permissive uniform policy, and was issued directly by NexaMotion's own personnel rather than through Arch's local management or the PDX Defendants. NexaMotion executive Joe Ferraracci also spoke directly with drivers at Arch locations about their working conditions and reprimanded at least one Arch driver about dress code compliance. When Plaintiff D'Amico told Ferraracci that the busier he was, the less he made, because of the cost of the miles he drove, Ferraracci responded, in substance, that he was better off as an independent contractor.

37. On information and belief, NexaMotion, not Arch, selected the PDX Defendants as Arch's delivery-staffing intermediary following NexaMotion's acquisition of Arch, based on NexaMotion's pre-existing use of the PDX Defendants at other locations it owns or controls outside New York.

38. NexaMotion is an "employer" of Plaintiffs and similarly situated drivers within the meaning of the FLSA and the NYLL, whether as a direct employer, joint employer, or part of a single, integrated enterprise together with Arch, Transtar, the PDX Defendants, Questfleet, CallAida LLC, the Third-Tier Defendants, and/or the John Doe Defendants.

**D. Defendant Transtar Industries, LLC**

39. Defendant Transtar Industries, LLC ("Transtar") is an Ohio limited liability company authorized to do business in New York, with its principal place of business at 7350 Young Drive, Walton Hills, Ohio 44146. Transtar does business under the NexaMotion Group name and logo. On information and belief, Transtar is the NexaMotion entity that pays Arch's own store-level personnel, including the Arch dispatchers who assign, route, and monitor Plaintiffs' deliveries. Transtar pays those dispatchers as hourly employees, through a payroll account maintained under an Arch department code, and pays them overtime for hours worked over forty in a workweek. The drivers they dispatch work comparable hours and receive no overtime at all.

40. Transtar is an "employer" of Plaintiffs and similarly situated drivers within the meaning of the FLSA and the NYLL, whether as a direct employer, joint employer, or part of a single, integrated enterprise together with Arch, NexaMotion, the PDX Defendants, Questfleet, CallAida LLC, the Third-Tier Defendants, and/or the John Doe Defendants.

**E. The PDX Defendants**

41. Defendant Parts Distribution Xpress, Inc. is, on information and belief, a Pennsylvania corporation with its corporate headquarters at 1019 4th Avenue, Lester, Pennsylvania, that, together with its corporate affiliate PDX North, Inc. (a Pennsylvania corporation authorized to do business in New York, NY DOS ID No. 3098215) and any other PDX-branded affiliate (collectively, the "PDX Defendants"), has served as Arch's most recent

purported independent-contractor staffing intermediary, having taken over that role from Questfleet at Arch's New York locations in November 2024.

42. On information and belief, the PDX Defendants operate as a single, integrated enterprise sharing common ownership, management, the "PDX" branding, and business operations, such that each is jointly and severally liable for the violations alleged herein.

43. The PDX Defendants purported to pay Plaintiffs and similarly situated drivers as independent contractors, notwithstanding that Arch and/or the PDX Defendants controlled the terms and conditions of drivers' work in every material respect.

44. The PDX Defendants are "employers" of Plaintiffs and similarly situated drivers within the meaning of the FLSA and the NYLL, whether as direct employers, joint employers, or part of a single, integrated enterprise together with Arch, NexaMotion, Transtar, Questfleet, CallAida LLC, the Third-Tier Defendants, and/or the John Doe Defendants.

**F. Defendant Questfleet, LLC**

45. Defendant Questfleet, LLC ("Questfleet"), formed in 2019, served as Arch's purported independent-contractor staffing intermediary at its New York locations from at least the beginning of the Class Period until the PDX Defendants took over that role in November 2024. Twelve Plaintiffs worked for Arch through Questfleet during the Class Period.

46. Questfleet is an "employer" of Plaintiffs and similarly situated drivers within the meaning of the FLSA and the NYLL, whether as a direct employer, joint employer, or part of a single, integrated enterprise together with Arch, NexaMotion, Transtar, the PDX Defendants, CallAida LLC, the Third-Tier Defendants, and/or the John Doe Defendants.

**G. Defendant CallAida LLC**

47. Defendant CallAida LLC is a New York domestic limited liability company (NY DOS ID No. 7273669), first filed with the New York Department of State on March 7, 2024. On information and belief, CallAida LLC is Questfleet's undisclosed corporate successor and mere continuation, formed and used to allow Questfleet to continue operating under a new name, with the same ownership, management, and driver workforce, and no material change to drivers' pay, duties, supervision, or working conditions. Questfleet's pay to at least one Plaintiff continued without interruption other than a change in the name of the paying entity, from Questfleet to CallAida LLC, from approximately May 8, 2024 through approximately November 2024, when the PDX Defendants took over as the paying intermediary. CallAida LLC's registered agent for service of process is Ramon Dionicio Pichardo, 9734 93rd Street, 3rd Floor, Ozone Park, New York 11416, the same individual who, on information and belief, owns and operates Questfleet.

48. CallAida LLC is an "employer" of Plaintiffs and similarly situated drivers within the meaning of the FLSA and the NYLL, whether as a direct employer, joint employer, or part of a single, integrated enterprise together with Arch, NexaMotion, Transtar, the PDX Defendants, Questfleet, the Third-Tier Defendants, and/or the John Doe Defendants.

**H. The Third-Tier Defendants**

49. On information and belief, each Third-Tier Defendant is owned or operated by a PDX supervisor: Nova Express Delivers LLC ("Nova Express") by Shazarudin Subhan, and Sanchez Delivery Systems Inc. by Christian Sanchez. Those PDX supervisors directed and supervised the same drivers whose pay their companies issued. The Third-Tier Defendants thus both paid drivers and, through their principals, controlled the drivers' work.

50. Defendant Nova Express is a Florida limited liability company, Florida Department of State File No. L24000452472, filed on October 24, 2024, within weeks of the PDX Defendants

taking over as Arch's paying intermediary. Florida records list Subhan as a manger. Plaintiff D'Amico's bank deposits from Nova Express are labeled "Direct Deposit from NOVA EXPRESS DEL for PAYROLL." The Cash App account "$NovaExpressDelivers" is registered to Subhan, who serves as a supervisor for the PDX Defendants. A manager of Nova Express thus simultaneously serves as a supervisor for the PDX Defendants.

51. Defendant Sanchez Delivery ("Sanchez Delivery") is a New York business corporation, New York Department of State DOS ID No. 7089882, incorporated on September 26, 2023, in Queens County, with a service-of-process address of P.O. Box 520306, Flushing, New York 11352. Its principal Christian Sanchez also simultaneously serves as a supervisor for the PDX Defendants, and the Cash App account "$Sanchezdelivery1" through which drivers are paid is registered to him.

52. The PDX Defendants pay drivers who are ineligible for payment through the PDX Defendants' own payroll, including drivers who fail the PDX Defendants' screening, through at least three separate companies and one individual: Nova Express, Sanchez Delivery, a third company known as Masterclass, and PDX Key Account Manager Jariel Nevarez, who pays drivers from his personal account. Each pays those drivers separately, at a rate lower than the standard day rate, for the same work, at the same Arch locations, under the same supervision, and certain drivers also bear an additional payroll-processing fee of approximately 10 percent of their pay. Drivers paid through the Third-Tier entities at a $135 day rate are told they net approximately $115-$120 for a full 8.5 hour day; after the 10 percent fee and the weekly fees.

53. Plaintiffs D'Amico, Martinez, and Hall have been paid through Nova Express, Plaintiff K. Bowen was paid through Sanchez Delivery, and Plaintiff Rahman was paid directly by PDX Key Account Manager Jariel Nevarez.

54. When Defendants moved Plaintiff D'Amico's pay to a Third-Tier Defendant, Arch questioned him about the change, and Arch manager Navin told him, "I got a notice that you're now being paid under some other group." Arch thus knew of and accepted the arrangement.

55. In addition, Subhan, the PDX supervisor who operates Nova Express, told Plaintiff D'Amico that the PDX Defendants had told one or more of the Third-Tier Defendants that, if they ever got in trouble for the arrangement, they were on their own. That statement reflects the PDX Defendants' awareness that the arrangement was unlawful and their intent to shift responsibility for it onto entities they controlled.

56. Drivers paid through the Third-Tier Defendants or by Nevarez, including Plaintiffs D'Amico, K. Bowen, Hall, Martinez, and Rahman, were still required to wear PDX-branded shirts.

57. On information and belief, the PDX Defendants continue to take the standing weekly fees from these drivers' pay, and Nevarez or the paying entity takes approximately 10 percent. Nova Express, Sanchez Delivery, and Masterclass each pay other current Arch drivers.

58. Each of the Third-Tier Defendants is an "employer" of Plaintiffs and similarly situated drivers within the meaning of the FLSA and the NYLL, whether as a direct employer, joint employer, or part of a single, integrated enterprise together with Arch, NexaMotion, Transtar, the PDX Defendants, Questfleet, CallAida LLC, and/or the John Doe Defendants.

**I. John Doe Defendants**

59. Defendants John Doe Corporations 1 through 10 are other presently unidentified corporate or business entities that, on information and belief, have served as additional nominal staffing, payroll, dispatch, or logistics intermediaries for Arch's delivery-driver workforce in a manner materially identical to Questfleet, CallAida LLC, and the PDX Defendants, including, without limitation, Northeast Logistics, Inc., which is named as a defendant in the related

individual action described in Section IV.E.1 below, and Sir Lancellot Courier and Delivery Services Co. and Frankel Logistics, LLC, which are named in other PDX-related litigation described in Section IV.E.2 below. Plaintiffs will amend this Complaint to name these Defendants once their identities and precise roles are ascertained through discovery.

## IV. FACTUAL ALLEGATIONS

### A. Arch's Delivery-Driver Business Model and the Rotating-Intermediary Structure

60. Arch operates retail automotive-parts stores and delivery operations at numerous locations throughout New York, including in Jamaica, Hollis, Mineola, Brooklyn, and, on information and belief, additional locations in Queens, Brooklyn, the Bronx, and Long Island.

61. Rather than employing delivery drivers directly on its own payroll, Arch has, at different times, contracted with a series of nominally independent logistics or staffing companies, in succession: Diligent, then Questfleet (which continued operating under the name CallAida LLC for approximately six months in 2024, see Section III.G above), then the PDX Defendants, to staff, pay, and nominally "employ" the drivers who deliver parts from Arch's stores. In the related individual action described in Section IV.E.1 below, another entity, Northeast Logistics, Inc., is alleged to have served this same role.

62. At all relevant times, the intermediary Defendants (Questfleet, CallAida LLC, and the PDX Defendants) exercised meaningful control over Arch's drivers, but did so at Arch's direction and for Arch's benefit. They supervised drivers through their own supervisors, required drivers to wear their branded uniforms, controlled who could cover a driver's shift, took standing deductions from drivers' pay, and issued that pay while classifying drivers as independent contractors. The PDX Defendants also screened drivers before they could be paid through the PDX Defendants' primary payment channel, and prepared and posted drivers' weekly schedules at Arch

locations. Throughout each transition from one intermediary to the next, the substance of drivers' work, including what they delivered, where, when, and from which Arch location, remained dictated by Arch, as set forth in Section IV.B below. Each intermediary Defendant is therefore a joint employer of the drivers together with Arch.

**B. Defendants' Control Over the Manner and Means of Plaintiffs' Work**

***1. The FLSA "Economic Reality" Factors***

63. Under the FLSA, the Second Circuit asks whether, as a matter of economic reality, workers depend on the putative employer's business or are in business for themselves, considering control, opportunity for profit or loss, skill and initiative, permanence, and whether the work is integral to the business. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988).

64. Degree of control: Arch, directly or through the intermediary Defendants acting at Arch's direction, dispatched delivery orders and assigned delivery routes to Plaintiffs; set Plaintiffs' work schedules and shift start and end times; and required Plaintiffs to report to and work from specific Arch retail or warehouse locations.

65. Degree of control: No Plaintiff ever wore an Arch-branded uniform. Arch and NexaMotion nonetheless required Plaintiffs to wear uniforms branded with whichever intermediary was then staffing Arch's delivery operation (Diligent, then Questfleet, then CallAida LLC, then the PDX Defendants) and enforced compliance with that requirement directly. As set forth in Section III.C above, in or about August 2026, NexaMotion's own upper management personally overrode the PDX Defendants' more permissive uniform policy and required drivers to wear a branded shirt specifically.

66. Degree of control: Arch required Plaintiffs to clock in and out of each workday through a GPS-enabled dispatch application, "Extra Driver," that Arch controlled, which allowed

Arch's dispatchers and managers to view each Plaintiff's real-time location on a live map and recorded each Plaintiff's performance, time worked, and vehicle speed, rather than allowing Plaintiffs to record or report their own time and work as an independent business would.

67. Degree of control: Weekly driver schedules are prepared by the PDX Defendants and posted at the dispatch desk of each Arch location. For example, the schedule posted for the week of April 27 through May 3, 2026, is headed "Supervisor Alex Quiro" with his cell phone number, and "PDX Delivery Driver's #25 Weekly Work Schedule." It assigns each listed driver to fixed start and end times Monday through Saturday, with weekday shifts of 8:00 a.m. to 5:00 p.m., 8:30 a.m. to 5:30 p.m., or 9:00 a.m. to 6:00 p.m., and Saturday shifts beginning at 8:00 a.m. A copy of the posted schedule, with the supervisor's cell phone number redacted, is annexed hereto as Exhibit A.

68. Degree of control: Arch managers and dispatchers, including Navind Chattergoon a manager at the Arch Mineola direct drivers' work in real time. For example, on November 3, 2025, Arch texted Plaintiff D'Amico, while he was out on another run, to "[p]ick up parts from elmont store," and on another occasion, after he reported a completed stop, instructed him to "[r]eturn back to base." Drivers report each completed stop to Arch by text message throughout the day. PDX supervisors, in turn, coordinate driver scheduling and the creation of each new driver's Arch system PIN with Navin.

69. Degree of control: Arch, directly or through the intermediary Defendants, supervised and disciplined Plaintiffs for performance and conduct issues, and otherwise controlled the manner, means, and conditions of Plaintiffs' work in every material respect.

70. Degree of control: The PDX Defendants required drivers to pass a screening, including driver's-license, insurance, and criminal-background checks, before being paid through

the PDX Defendants' primary payment channel. The standing weekly deduction described in Section IV.C below increased from approximately $30 to approximately $40 per week in or about early 2026. When the PDX Defendants' screening rejected Plaintiff D'Amico, his pay was routed through a nominally separate paying entity, Nova Express, at a reduced day rate, below the applicable minimum wage and without overtime, for the same work, at the same location, under the same supervision, as drivers paid through the PDX Defendants' ordinary channel. The independent-contractor designation, and the identity of the entity nominally paying a given driver, were thus dictated unilaterally by Defendants' own screening decisions rather than by any arm's-length business relationship.

71. Degree of control: Supervisors from the Quest Defendants and the PDX Defendants told drivers that they could not have anyone cover a shift for them unless the replacement also drove through the Quest Defendants or the PDX Defendants.

72. Opportunity for profit or loss and investment: Plaintiffs were paid a flat day rate that did not vary based on the number of deliveries completed, the efficiency of the route driven, or any other exercise of managerial or entrepreneurial judgment on Plaintiffs' part, such that Plaintiffs had no meaningful opportunity for profit or loss beyond simply working more or fewer scheduled days. Nor could drivers freely send a substitute in their place.

73. Degree of skill and independent initiative: The delivery work Plaintiffs performed required no specialized skill, training, or licensure beyond an ordinary driver's license, and no independent initiative beyond following the routes and dispatch instructions Defendants assigned.

74. Permanence and duration: Plaintiffs' working relationships with Defendants were lengthy and continuous rather than discrete or project-based, ranging from several months to more than eight years.

75. Integral to the business: The delivery of automotive parts that Plaintiffs performed is not an ancillary or separable service but the core function of Arch's retail automotive-parts business; without drivers to complete deliveries, Arch could not fulfill orders placed by its customers.

***2. The NYLL Common-Law Control Factors***

76. Under the NYLL, the question is whether the putative employer controlled the means used to achieve the worker's results. *See Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198 (2003).

77. Plaintiffs did not work at their own convenience: Defendants set fixed daily start and end times and assigned specific delivery routes and dispatch orders that Plaintiffs were required to complete during those hours, not on a schedule of Plaintiffs' own choosing, as set forth in Section IV.C below.

78. Plaintiffs received no fringe benefits, such as health insurance, paid time off, or retirement contributions, from any Defendant.

79. Notwithstanding their nominal classification as independent contractors, Plaintiffs were paid on a regular, recurring basis by the intermediary Defendants using ordinary payroll-style methods including check, direct deposit, Zelle, Cash App, and, at times, cash. This is characteristic of an employer-employee payroll relationship, not a business-to-business invoicing arrangement between independent enterprises.

80. Notwithstanding their nominal classification as independent contractors, Plaintiffs were paid on a regular, recurring basis, in the same way employees on a payroll are paid.

81. The intermediary Defendants functioned as payroll processors for Arch's delivery operation. The PDX Defendants paid drivers through third-party payroll platforms, including

GigSafe and DCN. Drivers who could not be paid through those platforms, including drivers who did not pass GigSafe's screening, were paid instead through the Third-Tier Defendants, Nova Express and Sanchez Delivery. Because these companies are operated by PDX supervisors, they also exercise supervisory authority over the drivers they pay. Plaintiff Rahman was paid directly by PDX Key Account Manager Jariel Nevarez.

82. Some drivers were paid by ordinary payroll methods such as check, direct deposit, Zelle, Cash App, and, at times, cash. Plaintiff Rahman, for example, was paid by Zelle transfer directly by Nevarez, and Plaintiff K. Bowen was paid in cash on several occasions.

83. Plaintiffs were also subject to standing payroll deductions, including a recurring weekly fee of approximately $30 to $40 and, for certain Plaintiffs, an additional payroll-processing fee of approximately 10 percent. These are the features of an employer-employee payroll relationship, not a business-to-business invoicing arrangement between independent enterprises.

84. Plaintiffs worked fixed, Defendant-set schedules, typically six days per week with defined shift start and end times, as set forth in Section IV.C below, rather than a schedule of their own design. Weekly schedules of the delivery drivers were posted in each Arch locations.

### *3. Arch's Joint-Employer Liability Notwithstanding the Nominal Intermediary Structure*

85. Arch is also Plaintiffs' joint employer under the functional-control factors the Second Circuit applies to work routed through nominally independent subcontractors. *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003). Each of those factors is met here.

86. Premises and equipment: Plaintiffs picked up parts for delivery from, and were dispatched from, Arch's own retail and warehouse locations, and clocked their work through the "Extra Driver" dispatch application that Arch or the intermediary Defendants acting at Arch's direction controlled.

87. Responsibility passing between subcontractors without material change: As Arch's nominal intermediary changed from Diligent to Questfleet to CallAida LLC to the PDX Defendants, Plaintiffs' day-rate pay, fixed schedules, assigned worksites, uniform requirements, and job duties stayed the same. The same drivers, doing the same work, out of the same Arch locations, were simply re-badged under each new intermediary. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

88. Shifting as a unit: The intermediary Defendants had no Arch delivery operation that could shift as a unit to another client. When Arch replaced one intermediary with the next, the drivers did not leave with the outgoing intermediary; they stayed at Arch's locations, on Arch's routes and schedules, and were transferred as a group to the incoming intermediary. Arch's delivery workforce followed Arch, not the intermediary nominally paying it.

89. Integral line-job: As set forth above, Plaintiffs' delivery work was integral to, not separable from, Arch's core retail automotive-parts business.

90. Degree of supervision: As set forth above, Arch, directly or through the intermediary Defendants acting at its direction, supervised and disciplined Plaintiffs for performance and conduct issues.

**C. Plaintiffs' Common Pay Practices and Working Conditions**

91. Plaintiffs' job was to deliver Arch's automotive parts to Arch's customers, primarily auto repair shops and dealers. Drivers picked up parts at Arch's stores and warehouses, delivered them on routes Arch's dispatchers assigned, and returned to the store to wait for the next outbound orders. At each stop, drivers delivered the invoice to the shop office, collected payment on C.O.D. orders, and picked up customer returns, exchanges, and cores, which they wrote up on Arch credit memos. Some drivers, including Plaintiff Bicarie, also ran shuttle routes carrying parts

between Arch stores and warehouses, including Arch's Connecticut stores. Drivers called Arch's dispatcher throughout the day to report completed stops and receive their next assignments.

92. Plaintiffs' individual employment dates and worksites are set forth in Section III.A above and are incorporated here by reference. Plaintiffs and similarly situated drivers were subject to the common pay practices and working conditions described below.

93. Defendants paid each Plaintiff and similarly situated driver a flat day rate, generally between approximately $115 and $135 per weekday, when working a full day of 8.5 or more hours regardless of the number of hours worked, and approximately $100 for a partial Saturday. Defendants paid drivers weekly, by check, direct deposit, or payment application, and at times in cash.

94. Arch dispatchers assigned Plaintiffs and similarly situated drivers to fixed weekday shifts. Defendants required drivers to work a minimum of six days per week, Monday through Saturday, and some drivers, including certain Plaintiffs, also worked Sundays, for a seven-day workweek. Monday through Friday, drivers generally worked one of three shifts: approximately 8:00 a.m. to 5:00 p.m., 8:30 a.m. to 5:30 p.m., or 9:00 a.m. to 6:00 p.m. Arch dispatchers required drivers to take a 30-minute meal break each day, so that each weekday shift consisted of approximately eight and one-half hours of work. Saturday and Sunday hours varied by Arch location. On Saturdays, drivers generally worked from approximately 8:00 or 9:00 a.m. to 2:00 p.m., or from approximately 9:00 a.m. to 6:00 p.m. On Sundays, drivers generally worked from approximately 9:00 a.m. to 4:00 p.m. A driver who worked the required six days therefore worked approximately 47.5 to 51 hours per week, and a driver who also worked Sunday worked approximately 54.5 to 58 hours per week. The PDX Defendants resisted drivers' requests for days off, particularly Mondays. Job advertisements for Arch driver positions still advertise a six-day

schedule. As recently as late October 2026, an online advertisement sought delivery drivers for "a regional retailer" out of Hollis, Queens, where Arch operates a location, for "full time routes" from 9:00 a.m. to 6:00 p.m., Monday through Saturday, and stated: "This is a 1099 position! No taxes taken out!" Applicants were told to text a telephone number linked to the Cash App payment account of Subhan and Nova Express. Arch managers also require drivers to stay past their scheduled end time, and a driver who refuses risks being transferred to another Arch location the next day.

95. Each Plaintiff regularly worked the required six-day week. In addition, Plaintiffs Davis, Jones, and Wright generally worked seven days per week, and Plaintiffs C. Bowen, K. Bowen, Nazaire, and Singh worked Sundays in many weeks. Each Plaintiff therefore regularly worked more than forty hours per workweek, except for Plaintiffs Bicarie and D'Amico beginning in June 2026, described in Section III.A above, in which they have worked a reduced schedule.

96. The New York minimum wage applicable to Plaintiffs during the Class Period, 12 N.Y.C.R.R. § 142-2.1(a), was as follows:

| **Effective Date** | **New York City** | **Nassau, Suffolk, and Westchester Counties** |
|---|---|---|
| Dec. 31, 2019 | $15.00 | $13.00 |
| Dec. 31, 2020 | $15.00 | $14.00 |
| Dec. 31, 2021 | $15.00 | $15.00 |
| Jan. 1, 2024 | $16.00 | $16.00 |
| Jan. 1, 2025 | $16.50 | $16.50 |
| Jan. 1, 2026 | $17.00 | $17.00 |

97. At the low end of the day-rate range, a driver paid $115 per weekday and $100 for a partial Saturday earned approximately $675 for a 47.5-hour week, or approximately $14.21 per hour, and a driver paid $115 for each of six full days earned approximately $690 for a 51-hour week, or approximately $13.53 per hour. Both fall below the minimum wage in New York City

throughout the Class Period, and in Nassau and Suffolk Counties since December 31, 2021, before accounting for any deduction or vehicle expense.

98. Defendants told drivers they were independent contractors. Defendants never paid any Plaintiff an overtime premium for hours worked over forty in a workweek, and never gave any Plaintiff a wage notice or wage statements.

99. Defendants deducted approximately $30 to $40 per week from each driver's pay, under various labels, including a "security fee," a fee for "clothing," and a "Contractor Compliance & Administration" fee.

100. Drivers used their own vehicles to make deliveries. For nearly all of the Class Period, Defendants did not reimburse drivers' vehicle expenses at all. Only since approximately May 2026 have Defendants paid a so-called gas allowance, an increase of approximately 8 to 10 percent in drivers' pay, which Defendants withdrew without notice for a period and later restored, and which does not cover drivers' fuel costs, much less their other vehicle expenses. Defendants generally provide drivers an E-ZPass from the Arch Jamaica location for bridge tolls. Mileage varied by Arch location: drivers dispatched from Arch locations in New York City generally drove approximately 70 to 100 miles per day, drivers dispatched from Mineola approximately 100 to 120 miles per day (approximately 70 to 80 miles on a half day), and drivers dispatched from Plainview approximately 150 to 200 miles per day.

101. Arch managers and dispatchers at each Arch location supervised and directed drivers' work on a day-to-day basis. Drivers dealt with supervisors from the intermediary Defendants far less often, generally once a week or less. Defendants required drivers to wear a uniform branded with the intermediary then staffing Arch's delivery operation, and Arch and the intermediary Defendants barred all drivers from the Arch office without it. Arch also posted signs

in its stores, stating that all drivers must be in uniform before they can start working, with "no exception." Arch enforced that rule because NexaMotion and Transtar personnel monitored Arch locations, both through in-person visits approximately every two to three weeks and through cameras at Arch locations. When NexaMotion personnel saw something on the camera video they did not like, they regularly called Arch and directed it to reprimand the driver involved. On information and belief. Nexamotion executive Ferraracci reprimanded a driver for violating the dress code, and an Arch manager later confirmed both the reprimand and that Arch enforces the dress code more strictly when NexaMotion personnel are present. On information and belief, the Quest and PDX Defendants, by contrast, had no access to Arch's cameras or to the Extra Driver application.

102. Arch's Mineola branch, located at 290 Willis Avenue, Mineola, New York, posted written rules directed to "all drivers." Those rules required drivers, among other things, to write their name and the time on each invoice; to call the Arch dispatcher for part exchanges, cores, check payments, and C.O.D. customers who wished to sign; to call after their last delivery; to "be in uniform at all time"; to park in the back parking lot rather than at "the diner next door"; to bring shopping carts in from the parking lot; and to write up all customer returns on credit memos. The rules identify the Arch store's main number, the Arch dispatcher, and the Arch manager, Navin, as the drivers' points of contact. A copy of the posted rules is annexed hereto as Exhibit B. On information and belief, these instructions were also posted in other Arch locations.

103. Arch's Mineola branch manager, Navindra Chattergoon, also issued a written notice to "All Drivers" under NexaMotion Group branding. The notice directed drivers delivering to any Arch customer to go directly to the shop office and give the invoice only to the shop owner or manager, and it warned that "[f]ailure to follow this procedure and company regulations may

result in disciplinary action, up to and including legal consequences." A copy of the notice is annexed hereto as Exhibit C.

104. Arch's first intermediary was Diligent, which Questfleet later replaced, although Diligent was not fully phased out. Questfleet, formed in 2019, then paid drivers until November 2024, including, for several months in 2024, under the name CallAida LLC. Since November 2024, the PDX Defendants have paid drivers, either directly (through payroll companies DCN and GigSafe) or through shell entities, including Nova Express and Sanchez Delivery. PDX Key Account Manager Jariel Nevarez also paid certain drivers, including Plaintiff Rahman, directly from his personal account.

105. Arch is liable throughout the Class Period. Each intermediary Defendant is liable for the period in which it staffed or paid Arch's drivers: the Quest Defendants until November 2024; the PDX Defendants since November 2024; and each Third-Tier Defendant for the period in which it paid drivers. NexaMotion and Transtar are liable since NexaMotion acquired Arch in or around 2023.

106. None of the Plaintiffs were furnished, at the time of hire, with a wage notice containing the information required by NYLL § 195(1), including his or her rate or rates of pay, the basis thereof, and the identity and address of his or her employer(s).

107. None of the Plaintiffs were furnished, on each payday, with an accurate wage statement containing the information required by NYLL § 195(3), including the dates of work covered, the Plaintiff's rate(s) of pay, gross and net wages, and any deductions taken.

108. Defendants' failure to provide accurate wage notices and wage statements caused each of the named Plaintiffs concrete injury beyond the bare statutory violation. Because Defendants did not identify their true corporate identities, including their legal names, addresses,

and federal employer identification numbers, in any wage notice or wage statement, Plaintiffs did not know, and had no means of discovering, who their actual employer was. Because Defendants' wage statements did not itemize the deductions described in Section IV.C above, Plaintiffs could not determine whether those deductions were lawful or verify the amount of pay they were actually owed.

109. Defendants' failure to provide wage notices and wage statements was not an oversight. It was part of the misclassification and wage underpayment scheme. A compliant wage notice or wage statement would have required Defendants to identify the drivers' employer, state an hourly rate and an overtime rate, and report the hours each driver worked, every one of which would have contradicted Defendants' treatment of the drivers as independent contractors and revealed the unpaid overtime and minimum wages they owed.

110. Had Plaintiffs and other similarly situated drivers received accurate notices and statements identifying their true employer and itemizing all deductions from their pay, they would have been able to, and would have, asserted their rights under the FLSA and NYLL sooner.

**D. Similarly Situated Drivers**

111. On information and belief, Defendants employed and employ numerous other delivery drivers, including, per Plaintiffs' own estimates, approximately 11 or 12 additional coworkers known to each Plaintiff individually, across at least five different Arch locations, under the same or substantially similar terms, conditions, and pay practices described above: flat daily-rate pay without regard to hours actually worked, no overtime premium for hours over 40 per week, unlawful deductions, and no compliant wage notices or wage statements.

112. Given the number of Arch locations involved, on information and belief the putative FLSA Collective and New York Class described in Sections V and VI below include hundreds of current and former Arch delivery drivers.

**E. Related Litigation and Defendants' Pattern and Practice of Misclassifying Delivery Drivers**

113. Defendants' misclassification of Plaintiffs and similarly situated drivers is part of a broader, long-running pattern and practice, both by Arch in its successive use of Diligent, Questfleet, CallAida LLC, and the PDX Defendants, and by Diligent and the PDX enterprise independently, of misclassifying delivery drivers as independent contractors to avoid wage-and-hour, unemployment-insurance, and related obligations. This history bears directly on, among other things, Defendants' willfulness for purposes of the FLSA's three-year statute of limitations, 29 U.S.C. § 255(a), and liquidated damages, 29 U.S.C. § 260, and Defendants' good faith, or lack thereof, under the NYLL.

***1. Related Individual Action Pending in This District***

114. On February 28, 2026, another delivery driver, Moses Stoddard, represented by different counsel, filed an individual Fair Labor Standards Act and New York Labor Law action in this District against Arch, Parts Distribution Xpress, Inc., and Northeast Logistics, Inc. No class or collective allegations were pled in that action. *See Stoddard v. Northeast Logistics, Inc., et al.*, No. 1:26-cv-01176 (AMD)(RML) (E.D.N.Y., filed Feb. 28, 2026) (Donnelly, J.; Levy, M.J.). The *Stoddard* complaint alleges joint employment by all three defendants of an auto-parts delivery worker dispatched from a shared principal place of business at 181-02 Jamaica Avenue, Jamaica, New York 11432, and asserts unpaid overtime under the FLSA and NYLL and wage notice and wage statement violations under the WTPA. On information and belief, Northeast Logistics, Inc.

served the same role for Arch in *Stoddard* that Questfleet, CallAida LLC, and the PDX Defendants served for Plaintiffs here.

***2. Additional Shell and Intermediary Entities Identified in Related PDX Litigation***

115. In *Castaneda v. PDX North, Inc., et al.*, No. 1:23-cv-13087 (D. Mass., filed Dec. 14, 2023), PDX North, Inc. and Parts Distribution XPress, Inc. were sued alongside still further nominally independent delivery intermediaries: PDX West, LLC, Sir Lancellot Courier and Delivery Services Co., and Frankel Logistics, LLC.

***3. New Jersey Department of Labor Enforcement Action and $7 Million Settlement***

116. Between 2006 and 2019, the NJDOL conducted four separate audits of PDX North, Inc.'s (and its affiliate SLS Delivery Services, Inc.'s) driver workforce and determined that PDX North had misclassified more than 1,000 delivery drivers as independent contractors rather than employees. PDX North litigated this determination for over a decade, including a federal declaratory-judgment action, *PDX North, Inc. v. Wirths*, No. 3:15-cv-07011 (D.N.J., filed Sept. 22, 2015); a precedential appeal, *PDX North, Inc. v. Commissioner, New Jersey Department of Labor and Workforce Development*, Nos. 19-2968 & 19-2993 (3d Cir. Oct. 22, 2020) (affirming dismissal of PDX North's claims under *Younger v. Harris*, 401 U.S. 37 (1971), because PDX North faced an ongoing state judicial proceeding, while reversing and remanding as to affiliate SLS Delivery Services, Inc.); and a petition for certiorari, *PDX North, Inc. v. Asaro-Angelo*, No. 20-1327 (U.S.), denied October 4, 2021.

117. On December 5, 2025, PDX North entered a settlement with the NJDOL and the New Jersey Office of the Attorney General requiring PDX North to pay $5 million immediately (paid March 5, 2026), plus up to $2 million in additional penalties, suspended on condition that PDX North reclassify its delivery drivers as employees and comply with wage-and-hour, sick-

leave, unemployment-insurance, and workers'-compensation laws through January 1, 2029. This $7 million settlement was publicly announced on March 12, 2026. See N.J. Dep't of Labor & Workforce Dev., Press Release (Mar. 12, 2026), https://www.nj.gov/labor/lwdhome/press/2026/20260312_pdx.shtml.

**F. Unreimbursed Vehicle Expenses**

118. Under the FLSA's "free and clear" regulations, 29 C.F.R. § 531.35, wages are not paid free and clear of unlawful deductions, and are effectively "kicked back" to the employer, where an employee is required to make expenditures primarily for the benefit of the employer, and such expenditures may not be used to satisfy the employer's minimum-wage obligation. Where, as here, an employer requires delivery drivers to use their own personal vehicles to perform deliveries and does not reimburse them for the resulting operating costs, including fuel, maintenance, repairs, insurance, and depreciation, those unreimbursed costs are treated as a deduction from wages for purposes of determining compliance with the federal minimum wage.

119. Defendants required Plaintiffs and the FLSA Collective to use their own personal vehicles to perform deliveries for Defendants' benefit, and did not reimburse Plaintiffs or the FLSA Collective for any of the resulting vehicle operating costs. Defendants' own marketing materials tout the cost savings this "independent driver" arrangement provides to Defendants and their customers, savings that come directly out of Plaintiffs' and the FLSA Collective's own pockets.

120. The Internal Revenue Service's standard business mileage rate is a widely accepted, conservative measure of the per-mile cost of operating a personal vehicle for business purposes, encompassing fuel, maintenance, repairs, insurance, and depreciation, and is a reasonable proxy

for the unreimbursed vehicle operating costs Plaintiffs and the FLSA Collective incurred for Defendants' benefit. The applicable rate for each period relevant to this action is as follows:

| **Period** | **IRS Standard Mileage Rate** | **IRS Authority** |
|---|---|---|
| 2020 | $0.575 | IR-2019-215 |
| 2021 | $0.560 | IR-2020-279 |
| Jan. 1 to June 30, 2022 | $0.585 | IR-2021-251 |
| July 1 to Dec. 31, 2022 | $0.625 | IR-2022-124 |
| 2023 | $0.655 | IR-2022-234 |
| 2024 | $0.670 | IR-2023-239 |
| 2025 | $0.700 | IR-2024-312 |
| Jan. 1 to June 30, 2026 | $0.725 | IR-2025-128 |
| July 1 to Dec. 31, 2026 | $0.760 | Announcement 2026-11, 2026-29 I.R.B. 49 |

121. Applying the applicable IRS standard mileage rate for the relevant pay period to the mileage Plaintiffs and the FLSA Collective drove in Defendants' service reduces their effective hourly wage, in many instances, below the federal minimum wage of $7.25 per hour, particularly for Plaintiffs and FLSA Collective members who drove approximately 100 or more miles per day, consistent with Plaintiffs' own estimates of their daily mileage.

122. For example, Plaintiff D'Amico, dispatched from the Arch location in Mineola, New York, drove approximately 378 miles in the week of August 10, 2026, when the IRS standard mileage rate was $0.760 per mile, incurring unreimbursed vehicle costs of approximately $287 against weekly pay of $534 for at least approximately 36 hours of work. That left approximately $247, or no more than approximately $6.86 per hour, below the federal minimum wage of $7.25 per hour.

123. Defendants' wages were also not paid free and clear because Defendants required drivers to kick back part of their pay, directly or indirectly, for Defendants' benefit, through the standing weekly fees described in Section IV.C and, for drivers paid through the Third-Tier Defendants, a payroll-processing cut of approximately 10 percent retained by companies operated by PDX supervisors. 29 C.F.R. § 531.35. These kickbacks, together with drivers' unreimbursed vehicle expenses, reduced drivers' effective wages below the federal minimum wage and cut into the overtime compensation owed to them.

## V. FLSA COLLECTIVE ACTION ALLEGATIONS

124. The FLSA Plaintiffs bring Counts I and II on behalf of themselves and all similarly situated persons pursuant to 29 U.S.C. § 216(b), defined as:

> **All persons who worked as delivery drivers, including shuttle drivers who carried parts between Arch locations, dispatched from any Arch location, through Diligent, Questfleet, CallAida LLC, the PDX Defendants, the Third-Tier Defendants, and/or any other nominally independent staffing or logistics intermediary, and who were classified as independent contractors, at any time within three years prior to the filing of this Complaint through the date of final judgment (the "FLSA Collective").**

125. The FLSA Plaintiffs and the members of the FLSA Collective are similarly situated in that they were subject to Defendants' common policies and practices of classifying delivery drivers as independent contractors, failing to pay minimum wage and overtime compensation, and taking unlawful deductions from pay.

126. Plaintiffs are aware, based on their own observations across multiple Arch locations and their own estimates of coworkers who experienced the same pay practices, that numerous similarly situated individuals have been damaged by these common policies and practices, and

Plaintiffs anticipate that additional individuals will file consents to join this action as opt-in plaintiffs pursuant to 29 U.S.C. § 216(b) once notice issues.

## VI. RULE 23 CLASS ACTION ALLEGATIONS (NYLL)

127. Plaintiffs bring Counts III, IV, V, VI, and VII, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of themselves and a class defined as:

> **All persons who worked as delivery drivers, including shuttle drivers who carried parts between Arch locations, dispatched from any Arch location, through Diligent, Questfleet, CallAida LLC, the PDX Defendants, the Third-Tier Defendants, and/or any other nominally independent staffing or logistics intermediary, and who were classified as independent contractors, at any time within six years and 228 days prior to the filing of this Complaint through the date of final judgment (the "New York Class").**

128. The NYLL provides a six-year statute of limitations for wage claims, NYLL § 198(3), which was tolled for 228 days by Executive Order 202.8 and its subsequent extensions, issued in response to the COVID-19 pandemic. The New York Class period above reflects that tolling.

129. Numerosity: On information and belief, and consistent with Defendants' operation of numerous Arch locations across New York, the New York Class includes hundreds of individuals, such that joinder of all members is impracticable.

130. Commonality: Common questions of law and fact exist as to all members of the New York Class, including, without limitation: (a) whether Defendants misclassified drivers as independent contractors; (b) whether Arch, NexaMotion, Transtar, the PDX Defendants, Questfleet, CallAida LLC, the Third-Tier Defendants, and/or the John Doe Defendants were drivers' joint or single, integrated-enterprise employer(s); (c) whether Defendants failed to pay minimum wage and overtime compensation; (d) whether Defendants took unlawful deductions;

and (e) whether Defendants failed to provide compliant wage notices and wage statements under the WTPA.

131. Typicality: Plaintiffs' claims are typical of the claims of the New York Class because Plaintiffs, like other class members, were classified as independent contractors, paid a flat day rate without overtime, and denied compliant wage notices and statements.

132. Adequacy: Plaintiffs will fairly and adequately protect the interests of the New York Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the class, and Plaintiffs have retained counsel experienced in wage-and-hour class and collective litigation.

133. Predominance and Superiority: Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, given the relatively modest size of each individual class member's claim relative to the cost and burden of individual litigation.

## VII. CAUSES OF ACTION

### COUNT I
### Violation of the FLSA, Failure to Pay Minimum Wage, Including Through Unreimbursed Vehicle Expenses (29 U.S.C. § 206; 29 C.F.R. § 531.35), Against All Defendants, on Behalf of the FLSA Plaintiffs and the FLSA Collective

134. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

135. Defendants were and are "employers" of the FLSA Plaintiffs and the FLSA Collective within the meaning of 29 U.S.C. § 203(d), and were and are engaged in interstate commerce within the meaning of the FLSA.

136. Defendants misclassified the FLSA Plaintiffs and the FLSA Collective as independent contractors and failed to pay them the federal minimum wage, currently $7.25 per hour, free and clear, for all hours worked. As set forth in Section IV.F above, Defendants required drivers to bear the cost of operating their own vehicles for Defendants' benefit. After accounting for those unreimbursed vehicle expenses, as 29 C.F.R. § 531.35 requires, drivers' effective hourly wages fell below $7.25 per hour in many workweeks, particularly for drivers dispatched from Mineola and Plainview.

137. Defendants' conduct was willful within the meaning of 29 U.S.C. § 255(a), entitling the FLSA Plaintiffs and the FLSA Collective to a three-year statute of limitations, in light of, among other things, the extensive prior litigation and regulatory history described in Section IV.E putting the PDX enterprise, and, on information and belief, Arch, on notice of the misclassification issues alleged herein. Defendants' willfulness is further shown by their knowing maintenance and acceptance of the Third-Tier payment arrangement described in Section III.H above.

138. As a direct and proximate result of Defendants' violations of 29 U.S.C. § 206, the FLSA Plaintiffs and the FLSA Collective have suffered damages in an amount to be determined at trial, and are entitled to recover unpaid minimum wages, including unreimbursed vehicle-expense damages sufficient to bring their effective wages up to the federal minimum wage, an equal amount in liquidated damages pursuant to 29 U.S.C. § 216(b), and reasonable attorneys' fees and costs.

**COUNT II**
**Violation of the FLSA, Failure to Pay Overtime (29 U.S.C. § 207), Against All Defendants, on Behalf of the FLSA Plaintiffs and the FLSA Collective**

139. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

140. The FLSA Plaintiffs and the FLSA Collective regularly worked more than 40 hours per week.

141. Defendants failed to pay the FLSA Plaintiffs and the FLSA Collective overtime compensation at one and one-half times their regular rate of pay for hours worked in excess of 40 per week, as required by 29 U.S.C. § 207(a).

142. Defendants' failure to pay overtime compensation was willful within the meaning of 29 U.S.C. § 255(a), for the same reasons alleged above with respect to Defendants' minimum wage violations.

143. As a direct and proximate result of Defendants' violations of 29 U.S.C. § 207, the FLSA Plaintiffs and the FLSA Collective have suffered damages in an amount to be determined at trial, and are entitled to recover unpaid overtime compensation, an equal amount in liquidated damages pursuant to 29 U.S.C. § 216(b), and reasonable attorneys' fees and costs.

**COUNT III**
**Violation of the NYLL, Failure to Pay Minimum Wage (NYLL §§ 650 et seq., 663; 12 N.Y.C.R.R. § 142-2.1), Against All Defendants, on Behalf of Plaintiffs and the New York Class**

144. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

145. Defendants were and are "employers" of Plaintiffs and the New York Class within the meaning of NYLL § 190(3).

146. Defendants misclassified Plaintiffs and the New York Class as independent contractors and failed to pay them the applicable New York minimum wage set forth in Section IV.C above for all hours worked.

147. As a direct and proximate result of Defendants' violations of the NYLL's minimum wage provisions, Plaintiffs and the New York Class have suffered damages in an amount to be

determined at trial, and are entitled to recover unpaid minimum wages, liquidated damages pursuant to NYLL § 198(1-a), pre- and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT IV**
**Violation of the NYLL, Failure to Pay Overtime (12 N.Y.C.R.R. § 142-2.2), Against All Defendants, on Behalf of Plaintiffs and the New York Class**

148. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

149. Defendants failed to pay Plaintiffs and the New York Class overtime compensation at one and one-half times their regular rate of pay for hours worked in excess of 40 per week, as required by 12 N.Y.C.R.R. § 142-2.2.

150. As a direct and proximate result, Plaintiffs and the New York Class have suffered damages in an amount to be determined at trial, and are entitled to recover unpaid overtime compensation, liquidated damages pursuant to NYLL § 198(1-a), pre- and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT V**
**Unlawful Deductions in Violation of the NYLL (NYLL § 193), Against All Defendants, on Behalf of Plaintiffs and the New York Class**

151. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

152. NYLL § 193 prohibits an employer from making any deduction from an employee's wages except those that are either required by law or expressly authorized in writing by the employee for the employee's benefit and that fall within an enumerated category under NYLL § 193(1)(b) and 12 N.Y.C.R.R. § 195-4.4. Deductions for required work attire, and for fees or the employer's administrative costs, are expressly prohibited. 12 N.Y.C.R.R. § 195-4.5(b), (g).

153. Defendants made unlawful deductions from the wages of Plaintiffs and the New York Class, including: (a) standing weekly deductions totaling approximately $30 to $40, under various labels, including a "Security Fee" and a "Contractor Compliance & Administration" fee; (b) a payroll-processing fee of, on information and belief, approximately 10 percent of pay, taken from drivers paid through the Third-Tier Defendants; and (c) the reduction, approximately $20 per day, from the promised day rate of drivers paid directly by PDX personnel, including PDX Key Account Manager Nevarez. On information and belief, Defendants made the same deductions from the wages of other members of the New York Class. None of these deductions was for Plaintiffs' benefit, and none falls within any category of deduction that NYLL § 193(1)(b) permits. The only deduction authorizations in Plaintiff D'Amico's PDX onboarding packet cover security outerwear and related equipment, in amounts of $20.00 and $2.00, far less than the $30 to $40 Defendants deducted each week, and they authorize no payroll-processing fee at all. Any form a driver may have signed purporting to authorize the deductions therefore does not make them lawful.

154. As a direct and proximate result, Plaintiffs and the New York Class have suffered damages in an amount to be determined at trial, and are entitled to recover the amounts unlawfully deducted, liquidated damages pursuant to NYLL § 198(1-a), pre- and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT VI**
**Failure to Provide Wage Notice in Violation of the NYLL (NYLL § 195(1)), Against All Defendants, on Behalf of Plaintiffs and the New York Class**

155. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

156. NYLL § 195(1) requires employers to provide employees, in writing, at the time of hiring, with a notice containing, among other things, the employee's rate or rates of pay, the basis

thereof, allowances claimed, the regular pay day, and the name and address of the employer and any "doing business as" names used by the employer.

157. Defendants failed to provide Plaintiffs and, on information and belief, the New York Class with the wage notice required by NYLL § 195(1). The written notices serve as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Denying Plaintiffs such notice impinged on Plaintiffs' interests not only in being paid what is owed, but also in being able to advocate for the receipt of proper pay.

158. As a direct and proximate result, Plaintiffs and the New York Class are entitled to recover statutory damages of $50 for each work day that the violation occurred or continues to occur, up to a maximum of $5,000 per person, pursuant to NYLL § 198(1-b), together with reasonable attorneys' fees and costs.

**COUNT VII**
**Failure to Provide Accurate Wage Statements in Violation of the NYLL (NYLL § 195(3)), Against All Defendants, on Behalf of Plaintiffs and the New York Class**

159. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

160. NYLL § 195(3) requires employers to furnish employees with a wage statement with every payment of wages, listing, among other things, the dates of work covered, the employee's rate(s) of pay, gross and net wages, and any deductions taken.

161. Defendants failed to provide Plaintiffs and, on information and belief, the New York Class with compliant wage statements as required by NYLL § 195(3). The wage statements serve as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Denying Plaintiffs such statements

impinged on Plaintiffs' interests not only in being paid what is owed, but also in being able to advocate for the receipt of proper pay.

162. As a direct and proximate result, Plaintiffs and the New York Class are entitled to recover statutory damages of $250 for each work day that the violation occurred or continues to occur, up to a maximum of $5,000 per person, pursuant to NYLL § 198(1-d), together with reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the FLSA Collective, and the New York Class, respectfully request that this Court enter judgment against Defendants, jointly and severally, as follows:

A. Certifying this action as an FLSA collective action pursuant to 29 U.S.C. § 216(b) and authorizing notice to all members of the FLSA Collective;

B. Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23 as to the New York Class;

C. Designating Plaintiffs as representatives of the FLSA Collective and the New York Class, and designating Plaintiffs' counsel as Collective and Class Counsel;

D. Declaring that Defendants violated the FLSA and the NYLL as alleged herein, and that Defendants were Plaintiffs' and the FLSA Collective's and New York Class's joint and/or single, integrated-enterprise employers;

E. Awarding unpaid minimum wages under the FLSA and the NYLL;

F. Awarding unreimbursed vehicle-expense damages under the FLSA's "free and clear" rule, 29 C.F.R. § 531.35;

G. Awarding unpaid overtime compensation under the FLSA and the NYLL;

H. Awarding liquidated damages under 29 U.S.C. § 216(b) and NYLL § 198(1-a);

I. Awarding statutory damages under NYLL § 195(1) and § 195(3);

J. Awarding unlawfully deducted wages under NYLL § 193;

K. Awarding pre-judgment and post-judgment interest as permitted by law;

L. Awarding reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b) and NYLL § 198; and

M. Awarding such other and further relief as this Court deems just and proper.

Dated: Lynbrook, New York
November 2, 2026

Respectfully submitted,

By: ______________________________

Christopher Marlborough
THE MARLBOROUGH LAW FIRM, P.C.
375 Sunrise Highway, Suite 3
Lynbrook, New York 11563
(212) 991-8960
chris@marlboroughlawfirm.com

Marcus Monteiro, Esq.
MONTEIRO & FISHMAN, LLP
91 N. Franklin Street, Suite 108
Hempstead, New York 11550
(516) 280-4600
mmonteiro@mflawny.com

*Attorneys for Plaintiffs*